# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

)
MUWEKMA OHLONE TRIBE,   )
           )
     Plaintiff,   )
           )
   v.        )   Civil Action No. 03-1231  (RBW)
           )
KEN SALAZAR,      )
Secretary of the Interior, et al.,[1]  )
           )
     Defendants.  )
_____)

## MEMORANDUM OPINION

The Muwekma Ohlone Tribe (the "Muwekma"), the plaintiff in this civil case, brings this action under the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 554, 701-706 (2006), seeking review of the "Final Determination Against Federal Acknowledgment of the Muwekma Ohlone Tribe" ("Final Determination"), 67 Fed. Reg. 58, 631 (2002), issued by the Department of the Interior ("DOI" or "the Department"), which declined to grant federal recognition to the Muwekma as a Native American tribe under the acknowledgment criteria of 25 C.F.R. § 83 (2006) ("Part 83").  Complaint ("Compl.") ¶ 1.  Currently before the Court are the parties' cross-motions for summary judgment.  After careful consideration of the parties' submissions and all documents and exhibits presented with those filings,[2] the Court

---

[1] The plaintiff named the following individuals as defendants in its original complaint: (1) Gale Norton, in her official capacity as the Secretary of the Interior ("Secretary"); (2) Aurene Martin, in her capacity as the Acting Assistant Secretary for Indian Affairs; and (3) the Department of the Interior (collectively "the defendants" or "the Department").  Under Federal Rule of Civil Procedure 25(d)(1), the Court has substituted the current Secretary of the Interior, Ken Salazar, for the former Secretary, Gale Norton.  Similarly, the Court has also substituted Larry Echo Hawk, the current Assistant Secretary for Indian Affairs, in place of former Assistant Secretary Aurene Martin.

[2] There have been two rounds of summary judgment briefing in this case.  The first set of summary judgment motions filed in this case commenced on July 13, 2005.  The Court denied those motions without prejudice and

(continued . . .)

concludes for the following reasons that it must deny the plaintiff's motion for summary judgment and grant the defendants' cross-motion for summary judgment.

## I. Background

A.    Regulatory Framework

"The question of whether a Native American Group constitutes an Indian tribe is one of immense significance in federal Indian law."  H.R. Rep. 103-781, P.L. 103-454, Federally Recognized Indian Tribe List Act of 1994, 1994 U.S.C.C.A.N. 3768, 1994 WL 542741.  This is because federal recognition of a Native American group as a tribe "is a prerequisite to the

---

(. . . continued)

remanded the case to the Department for the purpose of having the agency explain why it "require[d the] Muwekma to proceed through the . . . tribal acknowledgment procedures while allowing other tribes that appear to be similarly situated to bypass the procedures altogether."  Muwekma Ohlone Tribe v. Kempthorne, 425 F. Supp. 2d 105, 125 (D.D.C. 2006) (Walton, J.).  After the Department supplemented the agency record with regard to the waiver issue, a second round of summary judgment briefing commenced on February 16, 2007.  In these second summary judgment briefs, the parties focused on the question to be answered on remand by the Department, but they also renewed their other arguments on the remaining claims.  See Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment at 36 (reasserting all grounds for summary judgment raised in its initial memorandum in support of motion for summary judgment); Memorandum in Support of Defendants' Cross-Motion for Summary Judgment and Response in Opposition to Plaintiff's Motion for Summary Judgment at 25 (recounting arguments raised in its initial cross-motion for summary judgment). The Court, therefore, will consider the arguments presented in both the first and second round of summary judgment briefing in assessing the merits of the plaintiff's claims under the APA and the Constitution.

Accordingly, the Court considered the following submissions in reaching its decision: (1) the plaintiff's Complaint ("Compl."); (2) the defendants' Answer; (3) the Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s First SJ Mem."); (4) the defendants' first Memorandum in Support of Defendants' Cross-Motion for Summary Judgment and Response in Opposition to Plaintiffs' Motion for Summary Judgment ("Defs.' First SJ Mem."); (5) the Reply Brief in Support of Plaintiff's Motion for Summary Judgment and Opposing Defendants' Motion for Summary Judgment ("Pl.'s First SJ Opp'n"); (6) the Reply Memorandum in Support of Defendants' Cross-Motion for Summary Judgment ("Defs.' First SJ Reply"); (7) the Plaintiff's Notice of Supplemental Authority ("Pl.'s Supp. Not."); (8) the Defendants' Response to Plaintiff's Filing for Supplemental Authority ("Defs.' Resp. to Supp. Not."); (9) the Plaintiff's Second Notice of Supplemental Authority ("Pl.'s Second Supp. Not."); (10) the Defendants' Response to Plaintiff's Second Notice of Supplemental Authority ("Defs.' Resp. to Second Supp. Not."); (11) the Plaintiff's Reply in Support of Second Notice of Supplemental Authority ("Pl.'s Reply to Second Resp."); (12) the Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Second SJ Mem."); (13) the Defendants' second Memorandum in Support of Defendants' Cross-Motion for Summary Judgment and Response in Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Second  SJ Mem."); (14) the Reply Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendants' Cross-Motion for Summary Judgment ("Pl.'s Second SJ Opp'n"); (15) the Defendants' Reply in Support of Defendants' Cross-Motion for Summary Judgment ("Defs.' Second SJ Reply"); (16) the Defendants' Supplemental Memoranda ("Defs.' Supp. Mem."); and (17) the Plaintiff's Opposition to Defendants' Supplemental Memorandum on Issues Set Forth in the Court's September 30, 2008 Order ("Defs.' Supp. Opp'n").

protection, services, and benefits" provided by the Federal government to Indian tribes, as well as the "immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship with the United States."  25 C.F.R. § 83.2. Pursuant to statutorily delegated authority, the Department is empowered with the authority to determine which currently unrecognized Native American groups meet the criteria for federal recognition.  25 U.S.C. §§ 2, 9 (2006); see also James v. HHS, 824 F.2d 1132, 1137 (D.C. Cir. 1987) (stating that "Congress has specifically authorized the Executive Branch to prescribe regulations concerning Indian affairs and relations.  The purpose of the regulatory scheme is to . . . determine which Indian groups exist as tribes" (citations omitted)).

In 1978, the Department promulgated regulations that formally addressed the tribal recognition process, 43 Fed. Reg. 39, 361 (Sept. 5, 1978) (codified at 25 C.F.R. § 54 et seq.) (recodified at 25 C.F.R. § 83 et seq.), and it later revised these regulations in 1994, Muwekma Ohlone Tribe v. Kempthorne, 452 F. Supp. 2d 105, 108 (D.D.C. 2006) (Walton, J.).  Under these regulations, there are three avenues available to an Indian entity seeking recognition as a tribe by the federal government.  The principal means for an American Indian entity to be recognized as a tribe is under 25 C.F.R. § 83.7, which sets forth seven "mandatory criteria" for tribal recognition. 25 C.F.R. § 83.7.  The Part 83 criteria are the following:

(a) The petitioner has been identified as an American Indian entity on a substantially continuous basis since 1900. . . .

(b) A predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present. . . .

(c) The petitioner has maintained political influence or authority over its members as an autonomous entity from historical times until the present. . . .

(d) A copy of the group's present governing document including its membership criteria. . . .

(e) The petitioner's membership consists of individuals who descend from a historical Indian tribe or from historical Indian tribes which combined and functioned as a single autonomous political entity. . . .

(f) The membership of the petitioning group is composed principally of persons who are not members of any acknowledged North American Indian tribe. . . .

(g) Neither the petitioner nor its members are the subject of congressional legislation that has expressly terminated or forbidden the [f]ederal relationship.

Id. The second means of attaining acknowledgment is through the "modified" Part 83 process, which is available to those entities that had been previously (but are not currently) acknowledged by the federal government as a Native American tribe. 25 C.F.R. § 83.8(a). Under the modified criteria, petitioning Native American entities that can provide substantial evidence of "[u]nambiguous previous [f]ederal acknowledgment," id., need only provide the following showing as to the first three Part 83 criteria: (1) that it had been identified as an American Indian entity on a substantially continuous basis "since the point of [its] last [f]ederal acknowledgment," 25 C.F.R. § 83.8(d)(1); (2) that "it comprises a distinct community at present," 25 C.F.R. § 83.8(d)(2); and (3) that "political influence or authority is exercised within the group . . . from the point of [its] last [f]ederal acknowledgment to the present," 25 C.F.R. § 83.8(d)(3). Finally, the last option for federal acknowledgment available to a Native American group is to seek a waiver of the Part 83 requirements, which the Secretary has the authority to grant if waiver of the requirements would be "in the best interests of the Indians."[3] 25 C.F.R. § 1.2.

A petitioner, however, is not required to provide conclusive evidence under each of the Part 83 criteria; rather, a "criterion shall be considered met if the available evidence establishes a reasonable likelihood of the validity of the facts relating to that criterion." Id. Furthermore, the Department, in evaluating a petition, is required to "take into account historical situations and

---

[3] As discussed below, there have been at least two recent instances in which the Secretary has waived the Part 83 requirements and granted federal acknowledgment to those entities. See infra at 17-18.

time periods for which evidence is demonstrably limited or not available." 25 C.F.R. § 83.6(e).

After evaluating all of the evidence proffered by a petitioner, should the Department conclude

that the evidence "demonstrates that it does not meet one or more criteria," or if "there is

insufficient evidence that it meets one or more of the criteria," then the Agency "may" deny

acknowledgment to a petitioner.[4] 25 C.F.R. § 83.6(d).

B.      History of the Verona Band and its Descendants

        The Muwekma Ohlone Tribe is a group of American Indians "located in Northern

California in the San Francisco Bay Area." Compl. ¶ 5. The name "Ohlone" is an alternative to

"Costanoan," which was a label given to "[t]he Indians along the Pacific coast near San

Francisco Bay," and "who were concentrated by the Spaniards before 1834 at the Mission San

Jose." Pl.'s First SJ Mem., Exhibit ("Ex.") 7 (Proposed Finding) at 10.[5] The plaintiff asserts that

its members descended from these Indians, id., although nine other Indian groups that submitted

petitions to the Department also "use[d] the Ohlone or Costanoan tribal name," which, according

to the Department, suggests that "the Muwekma . . . does not have an uncontested claim to

represent the descendants of all the Ohlone of the San Francisco Bay Area or all the territory of

the Costanoan-speaking peoples," id. at 9.

---

[4] As discussed below, the Court ultimately concludes that the Muwekma failed to provide sufficient evidence to the Department that it "has been identified as an American Indian entity on a substantially continuous basis since" 1927, when the Verona band was last recognized by the federal government. 25 C.F.R. § 83.7(a); see also 25 C.F.R. § 83.8(d)(1) (requiring petitioners with previous federal acknowledgment to demonstrate that "[t]he group meets the requirements of . . . [Section] 83.7(a), except that such identification shall be demonstrated since the point of last Federal acknowledgment"). Because the Muwekma's failure to meet the requirements of Section 83.7(a) was a sufficient basis for the Department to deny federal recognition to the group, see 25. C.F.R. § 83.6(d), the remainder of this background section, as well as the Court's analysis of the Muwekma's claims, will focus only on the facts relevant to the Department's Section 83.7(a) analysis.

[5] When providing a pincite for either the Department's Proposed Finding or Final Determination, the Court will utilize the administrative-record page number, rather than the number affixed by the Department in creating the report.

Nonetheless, the evidence in the administrative record does reflect that many of the Muwekma descended from Indians who resided near the Mission San Jose. Id. at 10. Specifically, there were two settlements located "in the area north of [the] historical Mission San Jose and east of San Francisco Bay, an area referred to today as the "'East Bay.'" Id. "The most prominent of these settlements was located in a canyon just southwest of the town of Pleasanton, California, and near a railroad station named Verona." Id.. The settlement came to be "known as the Alisal or Pleasanton rancheria, and its members were referred to by [United States] Indian agents as the Verona band." Id. The "second settlement, known as El Molino, was located near the town of Niles, which was within ten miles of Verona." Id. These "two Indian settlements, or Rancherias, . . . existed until the 1910[]s in Alameda County." Id.

In 1906, the Department appointed C.E. Kelsey to conduct a census of landless Indians residing on the Alisal and Niles settlements, id. at 67, in connection with the Act of June 21, 1906, which, inter alia, appropriated funds for the purchase of land for Indians who were not then residing on reservations, Compl. ¶ 14. Kelsey ultimately prepared a documented titled "Schedule [S]howing [N]on-[R]eservation Indians in Northern California," which noted that there were 29 individuals residing at the Pleasanton rancheria, and 14 individuals residing at the Niles Rancheria. Pl.'s First SJ Mem., Ex. 7 (Proposed Finding) at 67. In addition to the Kelsey census, the federal census conducted for Alameda County in 1910 "included a special Indian population schedule which enumerated 17 Indian residents of 'Indian town,' which appears to have been the Pleasanton rancheria." Id. at 10. According to the Department's findings, approximately "48 percent of the [Muwekma's] members descend directly from an Indian . . . on either the 1905-1906 Kelsey census of Pleasanton or Niles, or the 1910 Federal census of 'Indian town.'" Id. Within that 48 percent, "[a]bout 70 percent of the [Muwekma's] members

descend[ed] from an Indian woman, Avelina (Cornates) Marine . . . , who, according to recollections of her son in the 1960[]s, may have been raised in the household of the chief of one of those Indian Rancherias before the 1880[]s." Id. Furthermore, "[t]wo of Marine's children were listed on the 1910 census," although "Marine's other children . . . were not listed on [that] census." Id. It is from those unlisted children from whom "[t]he majority of the [Muwekma's] members descend." Id. Accordingly, "[a]ll of the [Muwekma's] members descend either from an Indian individual listed on the 1905-1906 Kelsey census," an Indian individual listed on the 1910 census, "or from an unlisted Marine sibling of an individual on these lists." Id.

The Department acknowledges that the Verona band was previously recognized by the federal government as an Indian tribe. Id. at 8. This prior recognition was based on evidence that "[t]he band was among the groups . . . under the jurisdiction of the Indian agency at Sacramento, California," and that "[t]he agency dealt with the Verona [b]and as a group and identified it as a distinct social and political entity." Pl.'s First SJ Mem., Ex. 47 (May 24, 1996 Letter from Department of Interior to Rosemary Cambra) at 1. Specifically, the Department found that in 1914, an agent of the Office of the Indian Affairs, C.H. Asbury, mentioned a "Verona band in Alameda County" as a "potential beneficiary of the" land-purchase program created by the Act of June 21, 1906. Pl.'s First SJ Mem., Ex. 7 (Proposed Finding) at 12. The Sacramento Agency also mentioned the possibility of purchasing land for the Verona band in 1923. Id. According to the Department, "[h]owever, no land was purchased for the group[,] and no negotiations to buy land on its behalf are known to have taken place." Id. And, "[i]n 1927, Superintendent L.A. Dorrington referred to the [Verona] band but concluded that land should not be purchased on its behalf." Id. Despite these references to the Verona band, the Department asserts that it is not aware of any "census of the members of the Verona band during the years

between 1914 and 1927." Id.  Nonetheless, the Department acknowledges that the Verona band

had been previously recognized by the federal government from Asbury's identification of the

Band in 1914 to Dorrington's recommendation that the government not purchase land for the

Band in 1927, id. at 8, and that neither Congress nor any executive agency ever formally

withdrew federal recognition of this group, Answer at 14.

In early 1989, the Muwekma submitted to the Department a letter of intent to petition for

federal acknowledgment as an Indian tribe.  Pl.'s First SJ Mem. at 11; Defs.' First SJ Mem. at 4.

In its response, the Department directed the Muwekma to file a formal petition for

acknowledgment along with detailed documentation in accordance with the Part 83 criteria.  Pl.'s

First SJ Mem., Ex. 46 (April 25, 1989 letter from Joseph Little to Rosemary Cambra) at 1

(cautioning Muwekma that "[b]ecause of the significance and permanence of acknowledgment

as a tribe, the process of evaluation is a lengthy and thorough one").  The Muwekma then

submitted a formal petition for acknowledgment in early 1995, as well as "thousands of pages"

of supplemental material, Pl.'s First SJ Mem. at 11, which included "primary and secondary

source documents, genealogical evidence, arguments by its researchers, and responses to

questions posed by the Department's staff," Defs.' First SJ Mem. at 5.  After reviewing the

Muwekma's petition and the accompanying materials, the Department concluded preliminarily

in May 1996 "that the Pleasanton or Verona Band of Alameda County[, from which members of

the Muwekma tribe are directly descended,] was previously acknowledged by the federal

government between 1914 and 1927."  Defs.' First SJ Mem. at 5; see also Pl.'s First SJ Mem. at

11.  The Department thus informed Muwekma "that it would be able to complete its petition

documentation with the expectation that it would be evaluated under the federal acknowledgment

regulations' modified criteria set out in § 83.8."  Defs.' First SJ Mem. at 5.

C.      The Muwekma's Petition for Acknowledgment

In its petition, the Muwekma asserts that the Verona band continued to exist as a tribal entity after 1928.[6]  See Pl.'s First SJ Mem. at 5 (asserting that "Congress . . . never enacted legislation terminating the trust relationship with the . . . Verona Band," and that the Band did "not voluntarily abandon[] tribal relations.").  For instance, the Muwekma presented evidence of a genealogical connection between the members of the Muwekma and "24 persons listed by the" Bureau of Indian Affairs ("BIA")[7] on a census of California Indians issued in 1933," Pl.'s First SJ Mem., Ex. 7 (Proposed Finding) at 12, and that its members had been listed on the judgment roll "on three separate occasions[:] in 1933, 1955[,] and 1970," Pl.'s First SJ Mem. at 6.  This list of Indians "was produced as a result of an act passed by Congress in 1928 [that] gave the Court of Claims jurisdiction to hear claims against the United States on behalf of the 'Indians of California' for compensation for aboriginal territory acquired by the [federal g]overnment."  Pl.'s First SJ Mem., Ex. 7 (Proposed Finding) at 12.  Specifically, the Act provided compensation to those claimants who were "Indians . . . residing in the State of California on June 1, 1852[, as well as] their descendants [who were] living in [the] State."  Id., Ex. 6 (Final Determination) at 22.

According to the Muwekma, "eligibility for the [judgment] roll depended on the applicant's ability to demonstrate affiliation with[,] and descent from[,] a tribe that had retained

---

[6] The Muwekma presented numerous items of evidence in support of its position that it had been recognized by external sources as an Indian entity between 1927 and 1985, but the Department ultimately concluded that the evidence only reflected identification by external sources from 1965 to 1971, and from 1982 to the present.  See id., Ex. 6 (Final Determination) at 47.  The Court, therefore, will limit its discussion to only those items of evidence that the Muwekma contends demonstrate external identifications of its organization from 1928 to 1965, and 1972 to 1982, and the Court will not consider whether the Department's conclusions as to the other items of evidence run afoul of the APA.

[7] The BIA is a component of the Department.  See United States Department of the Interior Official Website, http://www.interior.gov/bureaus/index.cfm.

tribal relations at least through the period of treaty-making."  Id.  In support of its position that

participation in the California Claims Act required membership in a federally recognized Indian

tribe, the Muwekma cited a question on the application form that asked the following question:

"What is your degree of Indian blood and to what Tribe or Band of Indians of the State of

California do you belong?"  Id.  Furthermore, the Muwekma noted in its petition that fourteen of

the eighteen applicants answered that question by identifying themselves as members of "some

variant of 'Mission San Jose.'"  Id.; see also id. at 23 ("In its discussion of these 18 applications,

the petitioner concludes every chart entry but one with the statement that the evidence shows

applicants 'identifying themselves' and their ancestors as 'Mission San Jose' Indians.").  In

particular, the Muwekma pointed to the application form of Jose Binoco, in which a BIA

examiner had written on the application that "[t]he applicant is a full blood Indian.  He is one of

the last surviving members of the Mission San Jose Indian band"; the Muwekma argued that this

comment exhibited an external identification by the BIA examiner of the individual's

contemporary tribal affiliation.  Id. at 24.  All of this evidence, the Muwekma argued, supported

its position that inclusion on the judgment roll "required tribal affiliation," and that "the approval

of applications provid[es] . . . an identification of a contemporary entity."  Id. at 21.

In addition to their ancestors' participation in the California Claims Act, the Muwekma

asserted in its petition that two of its members attended schools operated by the BIA.  Pl.'s First

SJ Mem., Ex. 7 (Proposed Finding) at 74.  Specifically, the Muwekma provided "twelve pages of

records from the Sherman Institute . . . which demonstrate[d] that Domingo Marine attended this

Indian school during the 1930's," as well as "nine pages of records which demonstrate that John

and Rayna Guzman attended the Indian school at Chemawa, Oregon."  Id., Ex. 6 (Final

Determination) at 30.  The Muwekma "contend[ed] that approval by the BIA of [school] enrollment constitutes evidence of an external identification of an Indian entity" by the BIA.  Id.

The Muwekma also relied on scholarly publications in support of its position that external sources had identified it as a tribal entity.  One example was "a paper written in 1955 by anthropologists Alfred Kroeber and Robert Heizer for use in Indian Claims Commission cases," id. at 32, which the Muwekma argued contained "a clear reference" to the Indians of the San Jose Mission, a group that had later taken refuge "in Pleasanton as one of the groups [that] continued to maintain their existence," Pl.'s First SJ Mem. at 39-40.  The Muwekma relied as well on a book authored by Malcolm Margolin in 1978 titled The Ohlone Way: Indian Life in the San Francisco-Monterey Bay Area, in which Margolin made the following observation: "Today the descendants of the Ohlone Indians are still among us . . . [as] a small, seldom noticed part of the Bay Area population."  Id. at 44.  The Muwekma also cited a 1978 article by Richard Levy published in the Smithsonian Institution's Handbook of North American Indians, which mentioned the formation of the Ohlone Indian Tribe, Inc. in 1971.  Pl.'s First SJ Mem., Ex. 7 (Proposed Finding) at 16.  The Muwekma argued that all of these references evidence an identification of the entity by external sources.

D.    The Department's Findings

The Department issued its proposed finding regarding the Muwekma's petition on July 30, 2001.  Id. at 1.  Because the Department initially made "a preliminary finding that the [group] was a successor to a previously recognized" tribe known as the Verona band, "which had been recognized as late as 1927," id. at 15, the Department concluded that the Muwekma need only present evidence that "satisf[ied] all of the criteria in paragraphs (a) through (g) of [Section] 83.7," 25 C.F.R. § 83.6(c), as modified by Section 83.8, 25 C.F.R. § 83.8(a), since 1927, id. at

15.  Even under the modified criteria of Section 83.8, however, "the Department propose[d] to

decline . . . acknowledge[ment of] the . . . Muwekma . . . as an Indian Tribe" because the

Muwekma did "not meet all seven criteria required for Federal acknowledgment."  Id. at 61.

Specifically, the Department concluded that the Muwekma did not, inter alia, meet the standard

set forth in Section 83.7(a), as modified by Section 83.8(d)(1), id., because the Muwekma failed

to present sufficient evidence of identification by external sources that it was "the same tribal

entity that was previously acknowledged[,] or as a portion that has evolved from that entity."  Id.

at 15 (quoting 25 C.F.R. § 83.8(d)(1)).  After the Muwekma presented additional evidence in

response to the issues raised by the Department, the Department then issued its Final

Determination on September 6, 2002, in which it adopted the conclusions presented in the

Proposed Finding and provided additional analysis regarding the newly presented evidence by

the Muwekma.  See generally Pl.'s First SJ Mem., Ex. 6 (Final Determination).

       As an initial matter, the Department concluded that the Muwekma failed to present

sufficient evidence that the entity had been identified "as the same tribal entity that was

previously acknowledged[,] or as a portion that has evolved from that entity."  Pl.'s First SJ

Mem., Ex. 7 (Proposed Finding) at 15 (quoting 25 C.F.R. § 83.8(d)(1)).  According to the

Department, the Muwekma could only produce one example between 1927 and 1995 where the

Muwekma was identified "as [the entity] that had evolved from the Indian settlement at the

Verona station," and the Department concluded that "[o]ne example is not sufficient to meet"

Section 83.8(d)(1).[8]  Id.  Accordingly, the Department evaluated the Muwekma's petition under

---

[8] It is not entirely clear why Rule 83.8(d)(1) requires a petitioner to demonstrate that not only has it been recognized as an American Indian entity on a substantially continuous basis since the date of last Federal acknowledgment, but that the petitioner must also show that it has "been identified by [external] sources as the same tribal entity that was previously acknowledged[,] or as a portion that has evolved from that entity."  After all, Rule 83.8(d)(5) makes clear that if a petitioner is not able to demonstrate that external sources have identified it as the same entity that evolved from the previously acknowledged tribe, then that requirement is dispensed with, and the petitioner need only show . . .

(continued . . .)

the alternative criteria prescribed in Rules 83.8(d)(5) and 83.7(a)—whether the Muwekma "has been identified as an American Indian entity on a substantially continuous basis" since the date it was last acknowledged by the Federal Government, or 1927.

Even under the modified standard of Rule 83.7(a), the Department concluded that the Muwekma failed to present sufficient evidence that it had been recognized as an American Indian entity on a substantially continuous basis by external sources between 1927 and 1985.[9] Id. at 24.  First, the Department rejected the Muwekma's argument that the listing of "its members or their ancestors . . . by the Bureau of Indian Affairs pursuant to the Act of May 18, 1928, which allowed Indian claims to be made against the United States," constitutes evidence of an external identification.  Id. at 73.  The Department concluded that "the claims against the United States authorized by that . . . act, as the petitioner acknowledges, were brought on behalf of the 'Indians of California,'" and thus "[a]pplicants applied as individuals, and their statements about their historical tribe of their ancestors were a form of self-identification of a[] historical, not contemporary entity."  Id.  In other words, "there was no need for the BIA to identify any specific tribe or band of Indians for the accepted applicants" in order to determine whether an applicant was eligible to recover under the Claims Act.  Id.  As further evidence of its findings, the Department pointed to a 1936 letter by the superintendent of the Sacramento Agency, who informed "Dolores (Lola) Marine Galvan, one of the [plaintiff's] ancestors," that she did not have

---

(. . . continued)

that it has been recognized as an American Indian entity on a substantially continuous basis since the date of last Federal acknowledgment.  It would appear, then, that the requirement that the petitioner had been identified as the same tribal entity that was previously acknowledged is completely superfluous—indeed, the Department seemingly recognized as much in the Proposed Finding.  See Pl.'s First SJ Mem., Ex. 7 (Proposed Finding) at 15 ("It is a peculiarity of the regulations that there is a lower evidentiary burden on this petitioner if it is evaluated since 1927 under 83.7(a) without modification by [S]ection 83.8(d)(1).").  In any event, the plaintiff does not challenge the Department's interpretation of Rule 83.8(d)(1) or 83.8(d)(5) in its motion for summary judgment, and thus the Department's interpretation of these provisions is of no concern to the Court in resolving the motions before it.

[9] The Department concluded that the Muwekma provided sufficient evidence that it "ha[d] been identified as an Indian entity by a variety of external observers on a consistent basis since 1985."  Pl.'s First SJ Mem., Ex. 7 (Proposed Finding) at 23.

"'ward status' or Federal recognition."  Id.  This correspondence was significant to the

Department because "Galvan was included on the 1933 judgment roll as a California Indian,"

and thus "the superintendent did not equate" eligibility under the Act "with 'ward status' or

Federal recognition."  Id.  The Department found further corroboration of its analysis in another

statement by the superintendent, in which he stated that "Mrs. Galvan is shown on the Roll of

California Indians . . . but does not have ward status and[,] therefore, is not eligible for any aid

from Federal funds through this agency."  Id. at 73-74.  As a result of its analysis, the

Department gave no weight to any evidence that an individual's recovery under the Claims Act

constituted an external identification of any American Indian entity.  Id. at 73.

The Department also found no probative significance in the fact that the claims

application asked the applicant to identify their "degree of Indian blood and [the] Tribe or Band

of Indians of the State of California" to which the applicant belonged.  Pl.'s First SJ Mem., Ex. 6

(Final Determination) at 22.  The Department noted that "fourteen of the 18 applicants answer

[that] question . . . with some variant of 'Mission San Jose,'" and that "[t]his response referred to

[nineteenth] century tribal ancestry, not to contemporary membership."  Id.  Furthermore, the

Department noted that two of the applicants had stated "Tribal name unknown," and that another

applicant had answered "Ohlones(?) Tribal name [u]nknown," and that these answers hardly

demonstrate contemporary tribal affiliation because "[g]enerally, an individual's active tribal

membership would not be unknown to him or her, while his or her specific tribal ancestry back

to 1852 could be unknown."  Id. at 22-23.  Thus, the claims application was "interpreted" by the

Department "to inquire about the applicant's historical tribal ancestry" and did not constitute a

contemporaneous identification by an external source.  Id. at 23.

Evidence that several members of the Muwekma attended Indian boarding schools also failed to persuade the Department.  Although the Department acknowledged a "1969 letter by [John] Guzman [that] refers to his attendance[] and his sister's attendance" at a BIA school, the Muwekma failed to provide the Department with "BIA records and school records," and thus it was "impossible" for the Department "to know on what basis these individuals attended these schools." Id.  This was especially true, according to the Department, "because some Indian students were accepted on the basis of their blood degree, rather than their tribal membership." Id. at 74.  Thus, the Department concluded that "attendance at these Indian schools was not necessarily based on identification of an Indian tribe or group." Id.

In response to the Proposed Finding, the Muwekma submitted, inter alia, "[a]n application form for John Guzman, dated 1944," but the Department concluded that "[t]he form contain[ed] no information on tribal membership and no tribal certification or endorsement." Pl.'s First SJ Mem., Ex. 6 (Final Determination) at 31.  And, while the form listed John Guzman's tribe as "Mission," the Department found this to be a "generic reference[ that] applies to many separate Indian groups," and that it did not "refer to the [Muwekma] as a specific Indian entity." Id.  Indeed, "[a]n incomplete copy of a 1944 letter from the Sacramento Indian Agency about . . . [John] Guzman stated: "There is no doubt that these children have sufficient Indian blood to admit them to a Government Boarding School." Id.  Based on this evidence, the Department concluded that entry into the boarding schools was not based on tribal affiliation, but rather on "their degree of Indian blood." Id.

Finally, the Department rejected the scholarly articles that the Muwekma relied on in demonstrating external identifications.  First, the Department declined to accept the Smithsonian Institution's Handbook of North American Indians as an example of an external identification of

the Muwekma for several reasons.  The Department found that the author of the article merely

"described the Costanoan language family and concluded that the aboriginal Costanoan were

neither a single ethnic group nor a political entity."  Id. (internal quotation marks omitted).

Furthermore, the Department noted that the author "referred to [the] Pleasanton [rancheria] as

one of the multiethnic Indian communities [that] existed for a period of time after the

secularization of the missions in 1834."  Id.  For these reasons, the Department discerned no

reference to the Muwekma by the author of the book.  See id.

Second, the Department rejected the Muwekma's reliance on the 1955 paper written by

anthropologists Alfred Kroeber and Robert Heizer.  Id. at 32-33.  In the paper, the authors

"selected and examined a small, non-random[] 'strategic sample' of the 1933 census roll of the

'Indians of California' as prepared by the [Department] in response to claims brought under the

Indian claims jurisdiction act of 1928."  Id. at 32-33.  Based on the Department's analysis, it

concluded that the authors "did not claim that Indian entities or settlements existed in 1955, or in

1933, but that historical groups that had lost their distinct culture had surviving lineal

descendants in the population of California at the time of the 1933 list."  Id. at 33.  Put

differently, the Department construed the 1955 paper as arguing "that even though Indian

cultures had become extinct, Indian populations had not."  Id.  Thus, the Department concluded

that the "1955 paper is not evidence sufficient to meet" Section 83.7(a) because "[w]hether

individuals of Indian descent survived until 1933, or later, is not the test posed by criterion (a)."

Id.

The Department also declined to give weight to the 1978 Margolin study.  Id. at 44.  The

Department found that "the book is an account of an Ohlone lifestyle prior to European

settlement, and thus is not relevant to an analysis of the petitioner since 1927."  Id.  The

Department acknowledged a passage cited by the petitioner in which the author noted that "the descendants of the Ohlone Indians are still among us. . . . [as] a small, seldom noticed part of the Bay Area population," but the Department found this to be merely an "acknowledge[ment of] the existence of living Ohlone individuals," and not an identification of "any Indian entity in 1978." Id. (alteration in original).

E.     The Department's Affirmation of Tribal Status for the Lower Lake and Ione Tribes

        In 1994, the Department conferred federal recognition upon the Ione Band of Miwok ("Ione"), a Central California Indian tribe.  Pl.'s First SJ Mem. at 25; id., Exs. 61-63; see also Compl. ¶ 26; Answer at 22.  The Department similarly acknowledged the tribal status of the Lower Lake Rancheria of California ("Lower Lake"), another Central California tribe, by placing it on the list of federally recognized tribes in 2001.[10]  Pl.'s First SJ Mem. at 24; id., Ex. 60; see also Compl. ¶ 26; Answer at 23.  Neither the Ione nor Lower Lake were required by the Department to submit a formal petition for tribal acknowledgment under Part 83, nor were they required to undergo the "lengthy and thorough" process of evaluation "based on detailed documentation provided by the petitioner," Pl.'s First SJ Mem., Ex. 46, before receiving the benefits of federal tribal recognition, Compl. ¶ 26; Answer at 22, 23 (admitting that the Department "clarified the status of [Ione] . . . [and] reaffirmed the status of [Lower Lake]

_____

[10] There is some confusion in the record regarding the year in which the tribal status of Lower Lake was formally acknowledged.  See Compl. ¶ 26 (stating that "in 2002, [Lower Lake] . . . was reaffirmed by administrative action"); Answer at 23 (admitting that "in December 2000, [the Department] reaffirmed the status of [Lower Lake]"); Pl.'s First SJ Mem. at 24 (stating that "[o]n January 3, 2001, the Department announced that it would correct its records to recognize [Lower Lake]") (citing Pl.'s First SJ Mem., Ex. 60 (January 3, 2001 DOI news release)).  The precise date of Lower Lake's recognition is not material to this litigation, but for convenience the Court will refer to January 3, 2001, the date on which the Department formally stated that it had "reaffirmed the federal trust relationship between the United States and . . . [Lower Lake]," as the operative date.  Pl.'s First SJ Mem., Ex. 60 at 1.  The Department also extended federal acknowledgment to two Alaska tribes, without requiring them to proceed through the Part 83 process, at the same time it recognized Lower Lake.  Pl.'s First SJ Mem. at 24 (citing Pl.'s First SJ Mem., Ex. 60); Pl.'s Opp. at 2; Answer at 30 (stating that "the former Assistant Secretary reaffirmed the status of two Alaska Native villages outside the [P]art 83 acknowledgment procedures during the pendency of the Muwekma petition").

without requiring [them] to submit . . . petition[s] under . . . Part 83"); Answer at 30 (admitting

that "while the [Muwekma] Tribe's petition for recognition was pending, the Department

reaffirmed the status of [Ione] and [Lower Lake] outside the [Part 83] procedures").  Moreover,

the Department does not dispute  the Muwekma's allegation that the Ione and Lower Lake, like

the Muwekma, "were . . . Central California tribes previously recognized at least as late as 1927"

who did not appear on the 1979 list of federally recognized tribes despite "never [having] been

terminated by Congress [or] by any official action of [the Department]."  Pl.'s First SJ Opp. at 5;

see also Pl.'s First SJ Mem. at 23-27; Answer at 22-23.

The Muwekma alleges that on several occasions, it requested that the Department

reaffirm its tribal status through administrative correction, as the Department had done with the

Ione and Lower Lake, without requiring that its completed petition be evaluated under the Part

83 criteria.  Pl.'s First SJ Mem. at 11; Compl. ¶ 27; Answer at 23.  The Department denied the

Muwekma's requests, stating that it did not have the power to restore the Muwekma to the list of

recognized tribes by administrative means.  Pl.'s First SJ Mem. at 11; Compl. ¶ 27; Answer at 23

(admitting that "[n]otwithstanding the Department actions to the contrary with respect to the Ione

Band and Lower Lake, [Department] staff repeatedly advised [Muwekma] that the Assistant

Secretary [of Indian Affairs] lacked authority to administratively reaffirm tribal status").

F.      The Present Litigation

The Muwekma brought this action on June 6, 2003, seeking reversal of the Final

Determination, placement on the Department's list of federally recognized tribes, and other

injunctive relief.  Compl. at 18.  On July 13, 2005, the Muwekma moved for summary judgment,

alleging that (1) "the Department recognized the Muwekma . . . under congressional legislation

at least until 1927," Pl.'s First SJ Mem. at 17, and because "Congress has the sole authority to

terminate tribes," id. at 15, the Department "had no authority to withdraw recognition [of the Muwekma] in the Final Determination, id. at 17; (2) the Department's recognition of the Verona band in 1927 "established a trust relationship" and that the Department's Final Determination "constituted [a] serious violation[] of its fiduciary duty to the Muwekma," id.; (3) the Department violated the APA and the Equal Protection Clause when it required Muwekma to petition for acknowledgment of its tribal status pursuant to the "lengthy and thorough" regulatory procedures of Part 83, id., Ex. 46, despite administratively reaffirming the status of similarly situated tribes without requiring those tribes to undertake the Part 83 process and without sufficient explanation for the disparate treatment, id. at 21-22, 26-30; see also Pl.'s First SJ Opp'n at 9-12; Compl. ¶¶ 37-39, 44-47; (4) the Department violated the Muwekma's due process "right to continued recognition, including the associated services, protections[,] and financial benefits," id. at 30; (5) the Department violated Section 554(d) of the APA by allowing "one of its attorney advisors" to both represent the Department in an earlier litigation involving the Muwekma,[11] and "advise[] . . . the Department[ in its] decision on the merits of the Muwekma's petition for recognition," id. at 33; see also 5 U.S.C. § 554(d) (barring "[a]n employee or agent" of an agency to participate both "in the performance of investigation or prosecuting functions for an agency" and to "participate or advise in the decision recommended decision, or agency review" of that same or "factually related case, . . . except as witness or counsel in public proceedings"); and (6) "the Final Determination was arbitrary and capricious because it improperly refused to consider, rejected[,] or misconstrued substantial evidence demonstrating

---

[11] The prior litigation in this Court referenced by the Muwekma involved a petition for a writ of mandamus it filed to compel the Department "to complete within twelve months its review of the [Muwekma's] petition for acknowledgment as a federally recognized Indian tribe." Muwekma Tribe v. Babbitt, 133 F. Supp. 2d 30, 31 (D.D.C. 2000) (Urbina, J.). Judge Urbina ultimately directed the Department to conclude its review of the Muwekma's petition by March 11, 2002. Muwekma Tribe v. Babbitt, 133 F. Supp. 2d 42, 51 (D.D.C. 2001) (Urbina, J.).

that the Tribe satisfied the recognition criteria" set forth under Section 83, id. at 35.  In response

to Muwekma's summary judgment motion, the defendants filed a cross-motion for summary

judgment on September 12, 2005, arguing that (1) the Muwekma's claim that the Department

unlawfully withdrew recognition in the Final Determination "is barred by the statute of

limitations[] because it accrued more than six years ago," Defs.' First SJ Mem at 28; (2) even

assuming that the action is not barred by the statute of limitations, "it is clear that [the

Department's] application of the federal acknowledgment regulations to [the p]laintiff's petition

and subsequent [F]inal [D]etermination were lawful," id. at 32; (2) the Muwekma's assertion of a

trust obligation owed to it by the Department "has no merit," id. at 37, because its "claim is

premised on its faulty belief that it continues to be a recognized tribe," id. at 38; (3) the

Muwekma's due process claim cannot survive because it does not have a "critical

constitutionally protected property interest" in federal acknowledgment as a Native American

tribe, id. at 42; (4) Section 554(d) is inapposite because "by its express terms," the statute applies

in cases where an "[a]djudication [is] required by statute to be determined on the record after

opportunity for an agency hearing," id. at 48; (5) the Department did not violate the Equal

Protection Clause because it had a rational basis for requiring the Muwekma to petition under

Section 83, id. at 39-40, and that "groups demonstrating or alleging characteristics similar to

[Muwekma] are regularly required to proceed through the federal acknowledgment process," id.

at 40; see also Defs.' Reply at 17-19; and (6) "[t]he Assistant Secretary's final determination that

[the p]laintiff was not entitled to a government-to-government relationship with the United States

is fully supported by the lengthy administrative record in this case," id. at 9.

　　　The Court issued a memorandum opinion and order on September 21, 2006, in which it

denied both parties' motions for summary judgment and remanded this case back to the

Department to allow the agency to supplement the record.   Muwekma Ohlone Tribe v.

Kempthorne, 452 F. Supp. 2d 105, 107 (D.D.C. 2006).  Specifically, "the Court conclude[d] that

the defendants [had] not articulated a sufficient basis for the Department's disparate treatment of

Muwekma and the Ione and Lower Lake tribes."  Id. at 116.  While the Court acknowledged the

existence of the modified Part 83 procedures for those entities that can demonstrate prior federal

acknowledgment, the Court found the relevant inquiry to be "whether the Department has

provided a rational basis for requiring Muwekma to adhere to the Part 83 procedure while

exempting other tribes that are purportedly similarly situated."  Id. at 116.  After reviewing the

record, the Court concluded that "the Department . . . has never provided a clear and coherent

explanation for its disparate treatment of Muwekma when compared with Ione and Lower Lake,

nor has it ever, in the administrative record or in the papers before this Court, articulated

standards that guided its decision to require Muwekma to submit a petition and documentation

under Part 83 while allowing other tribes to bypass the formal tribal recognition procedure

altogether."  Id. at 121; see also id. at 119 ("[T]he defendants here have cited nothing to explain

the basis for [its] decision to treat Muwekma differently from Ione and Lower Lake."); id. at 120

("[T]he administrative record contains no indication why the Department would refuse to

consider Muwekma's requests for administrative correction while allowing Ione and Lower Lake

to proceed outside the Part 83 regulatory process."); id. at 124 ("[T]here is no contemporaneous

explanation of the Department's decision to treat Muwekma differently from Ione and Lower

Lake; indeed, it is the lack of a reasoned explanation in this regard that Muwekma is challenging

under the Equal Protection Clause and the APA."); id. at 125 ("[T]he Court is unable to discern

the Department's rationale for requiring Muwekma to proceed through the Part 83 tribal

acknowledgment procedures while allowing other tribes that appear to be similarly situated to

bypass the procedures altogether . . . .").  The Court did observe in a footnote that the agency had "obliquely" attempted to distinguish the Muwekma from the Lower Lake by noting that the government had previously acquired land in trust for the Lower Lake, and that the Lower Lake participated in an Indian Reorganization Act election, but the Court found this explanation insufficient to justify "the Department's allegedly differential treatment of Muwekma" because "this explanation pertain[ed] only to a difference between Muwekma and <u>one</u> of the tribes with whom it is claiming to be similarly situated," and that the record does not reflect that "it required the Muwekman and not Lower Lake to undergo the Part 83 procedure <u>because</u> the latter, unlike the former, had received land in trust and had participated in an election."  <u>Id.</u> at 118 n.13.  The Court, therefore, directed the Department to "provide a detailed explanation of the reasons for its refusal to waive the Part 83 procedures when evaluating Muwekma's request for federal tribal recognition."  <u>Id.</u> at 124.

On November 27, 2006, in response to the Court's memorandum opinion and order, the Department filed a document titled "Explanation to Supplement the Administrative Record – Muwekma Ohlone Tribe."  Explanation to Supplement the Administrative Record at 1.  In this submission, the Department explained that its "decisions to clarify the status of Ione in 1994 and to reaffirm [f]ederal recognition of Lower Lake in 2000 . . . were not based merely on a finding that those groups were previously recognized by the [f]ederal [g]overnment at some time in the past."  <u>Id.</u> at 2.  Rather, the Department found that the "Lower Lake and Ione . . . had trust lands, agreements, legislation, or consultation [with the Federal Government] decades later than 1927," where as the Muwekma had no such interactions with the federal government.  <u>Id.</u> at 7.  Rather, the Department explained that "[t]he Ione and Lower Lake decisions justified action on behalf of those groups that Muwekma did not share."  <u>Id.</u> at 3.  For those reasons, the Department

concluded that the "Muwekma was not similarly situated to either Ione or . . . Lower Lake." Id.
at 3.

　　　With regard to the Lower Lake, the Department noted that the record in that case
"demonstrates a pattern of Federal dealings with the Lower Lake Rancheria that differs from the
absence of any similar evidence for a Verona band." Id. at 7.  For instance, "[t]he [f]ederal
[g]overnment purchased land to establish the Lower Lake Rancheria on January 25, 1916," and
"[t]he government held this land in trust until the Act of 1956 authorized its sale." Id.  The
Department also cited a report issued in 1927 that both "advised against the purchase of land for
a Verona band," and "recommended that land be purchased for the Lower Lake band." Id.
Then, "[i]n 1935," the agency again sought to acquire additional land for the band and other
small groups." Id.  Several years later, the Department issued a report in which it "noted the
existence of a Lower Lake group living off the rancheria," after which it "authorized an
individual to move onto the rancheria and . . . surveyed the rancheria's population." Id.  The
Department also noted that the existence of the Lower Lake had been recognized by the federal
government on two separate occasions—in 1953, when the United States "House of
Representatives listed the Lower Lake Rancheria" in House Report 2503, and in 1980 when "the
BIA central office and regional office considered including the Lower Lake Rancheria on the list
of federally recognized tribes, but did not do so." Id.  Based on these dealings with the federal
government, the Department concluded that the "Lower Lake and Muwekma were not similarly
situated." Id. at 6.

　　　The Department also identified a history of contact between the federal government and
the Ione.  "The [f]ederal [g]overnment attempted to purchase land for" the Ione, which had been
explicitly "identified by a census made by a special agent in 1915." Id. at 7.  In 1916, "the

Indian Office obtained a deed and abstract of title for the purchase of land for the Ione[,] . . . and the Department provided the Office with a formal "Authority" for the purchase. Id. The Department then cited documents reflecting an "extensive, but unsuccessful, effort[] to clear title to the land for the" Ione from 1915 to 1925. Id. Then, "[i]n 1941, the Department considered a petition from the 'Indians of the Ione Valley' requesting the purchase of land." Id. at 7-8. "In 1970, two Ione individuals contacted the BIA about the status of the land on which they lived," and subsequently "the California Rural Indian Land Project . . . of the California Indian Legal Services proposed bringing a quiet[-]title action on behalf of the Ione Band . . . and requesting that the land be accepted and held in trust." Id. As a result, in October 1972, the Department issued a letter "accept[ing] by relinquishment of title or gift [a] parcel of land to be held in trust for the Ione Band of Miwok Indians." Id. The Department found that these facts, which evidenced a "historical circumstance of an uncompleted acquisition of trust land on the [Ione's] behalf," were sufficient to differentiate the Ione from the Muwekma.

As for the Muwekma, the Department concluded that the same 1927 report that recommended a land purchase for the Lower Lake concluded that "a land purchase did not need to be made for members of a Verona band." Id. The Department also noted that after 1906, various "appropriation acts that authorized purchases of land for homeless California Indians . . . also did not mandate action specifically on behalf of the Verona band." Id. Although the Muwekma contended that the author of the report "failed to carry out his instructions" to purchase land on behalf of the Verona band, the Department concluded that the author's "instructions contained no request for specific action or a specific result on behalf of a Verona band." Id. Rather, "[t]he instructions [he] received in 1927 were to submit a general report about California Indians, without making an extensive field investigation, and to identify the

band for whom land should be purchased." Id. (internal quotation marks omitted).  Thus, the Department concluded "that the historical circumstances of Muwekma can be distinguished from those of Ione and Lower Lake." Id. at 9.

Based on the Department's supplementation of the record, the plaintiff once again moved for summary judgment.  Although the plaintiff has reasserted all of the grounds it relied upon in its initial summary judgment filing, Pl.'s Second SJ Mem. at 36, the plaintiff focused its efforts on demonstrating that "the Department . . . denied equal protection of the law and acted arbitrarily and capriciously toward the Muwekma . . . by unreasonably refusing to reaffirm Muwekma's recognized status and by requiring it to submit instead to the burdensome procedures of . . . []Part 83[]," Id. at 1.  Specifically, the plaintiff argued, inter alia, that the Department's reliance on having "at least intended to purchase federal trust property" as a basis for distinguishing the Muwekma from Lower Lake and Ione "is merely a post hoc rationalization by Department officials that had nothing to do with the Ione or Lower Lake decisions at the time," id. at 28, because "[b]oth Congress and the Department of the Interior have repeatedly recognized tribes that had no land, and have specifically provided for the purchase of land, to be held in trust, after recognition, id. at 29 (footnotes omitted).  The Muwekma further argues that its review of federal-acknowledgment "decisions demonstrates that not one . . . decision uses the lack of federal trust land (or any attempts to secure such trust land) as evidence against a petitioner or as a negative factor under the criteria." Id. at 30 (footnote omitted).  The Muwekma also notes that "in neither of [the] decisions" relating to the Lower Lake or the Ione "did the Department state that the trust land . . . issue was a factor weighing in the decision to recognize these two Tribes outside of the Part 83 process." Id. at 33.  In any event, the Muwekma argues that "the trust land issue is a false factual distinction in any case" because "the Muwekma . . . , as

the Verona [b]and, was found to be eligible for trust land purchase," and that "none of [the three

Tribes] possessed any trust land at the time they sought recognition" by the federal government.

Id. (emphasis omitted).

The Department renewed its cross-motion for summary judgment, arguing, inter alia, that

the "[p]laintiff is not similarly situated to Lower Lake or Ione[] because it lacks a long-standing

governmental relationship with the United States."  Defs.' Second SJ Mem. at 8.  The

Department noted that "[i]n contrast to [the Lower Lake and Ione], there is no evidence of any

federal dealings with a Muwekma group or Verona band after 1927."  Id. (internal quotation

marks omitted).  The Department emphasized the fact that it had multiple dealings with the

Lower Lake, id., and that "[l]ike Lower Lake, Ione had a long-standing governmental

relationship with the United States[,] although sporadically documented."  Id. at 10.  As to the

Muwekma, however, the Department argued that the "[p]laintiff's relationship with the United

States ended much farther in the past."  Id. at 12.  The Department once again rejected the

position that the enrollment of individuals "for judgment funds awarded to the 'Indians of

California,'" and the attendance at BIA schools by "three individuals in the 1930[]s and 1940[]s"

was proof that the Muwekma was recognized as a tribal entity by the United States, arguing that

"the United States . . . provided funds and services to individual Indians."  Id. at 13.  As a result,

the Department argued that "these allegations fail to establish that [the p]laintiff is similarly

situated to [the] Lower Lake and Ione."  Id.

After considering the parties' renewed submissions, the Court issued an order on

September 30, 2008, concluding that the Department's "arguments, and the explanation . . .

giving rise to them, seemingly cannot be reconciled with the Court's September 21, 2006

[M]emorandum [O]pinion."  Id. at 5.  The Court noted that it had "determined in its prior

[M]emorandum [O]pinion that the defendants' arguments to the effect that the plaintiff was not similarly situated to Ione and Lower Lake were without merit," and that "[t]he necessary implication of both conclusions is that the Court found the plaintiff to be similarly situated to Ione and Lower Lake."  Id. at 7.  The Court explained that it had "remanded the case to the Department so it could explain why it treated similarly situated tribes differently, not so that it could construct post-hoc arguments as to whether the tribes were similarly situated in the first place."  Id. at 9.  The Court further stated that "[i]t certainly did not remand the case so that the Department could re-open the record, weigh facts that it had never previously considered, and arrive at a conclusion vis-à-vis the similarity of the plaintiff's situation to those of Ione and Lower Lake that it had never reached before."  Id. at 9.  Accordingly, the Court stayed the parties' summary judgment motions, id. at 1, and directed "the parties to file supplemental memoranda of law addressing . . . whether the Court should consider administrative records pertaining to the [Lower Lake and Ione] that were not considered when the Department issued its initial decision denying the plaintiff's petition for recognition," id. at 9.

The Department filed its Supplemental Memorandum on October 30, 2008.  Defs.' Supp. Mem. at 16.  The Department asserts that it "did not understand the Court's Order of September 21, 2006, to have held that [the p]laintiff was similarly situated to [the] Ione and Lower Lake" because the Court had concluded that . . . 'it lack[ed] sufficient information about the Department's decision to recognize [the] Ione and Lower Lake outside of the Part 83 process." Id. (quoting Muwekma, 452 F. Supp. 2d at 113).  In any event, the Department argues that "neither the law-of-the-case doctrine nor the mandate rule apply to [the d]efendants' arguments regarding [the p]laintiff's equal protection and APA claim," id. at 2, "because the Court's Order of September 21, 2006, was an interlocutory order," id. at 3, and such "'orders are not subject to

the law-of-the-case doctrine and may always be reconsidered prior to final judgment,'" id.
(quoting Langevine v. Dist. of Columbia, 106 F.3d 1018, 1023 (D.C. Cir. 1997)).  Furthermore,
the Department notes that "courts generally recognize an exception to the mandate rule in the
event that an earlier decision was erroneous," id. at 5 (citing United States v. Allen, 41 Fed.
App'x 367, 369 (10th Cir. 2002) and United States v. Amedeo, 487 F.3d 823, 830 (6th Cir.
2006)), and because it asserts that the findings set forth in the Explanation to Supplement the
Administrative Record "demonstrate[] that [the p]laintiff is not similarly situated to Ione and
Lower Lake in critical respects . . . . [,] the Court should deviate from its earlier mandate and
further consider the question of whether [the p]laintiff is similarly situated to Ione and Lower
Lake," id. at 6.

　　The Muwekma has responded to the Department's supplemental memorandum by
asserting that the Department "was . . . bound to follow the mandate of this Court and limit the
scope of its remand to the Memorandum Opinion's order of an 'express justification' and a
'detailed explanation of the reasons' for requiring Muwekma to proceed through the lengthy
federal acknowledgment process while exempting" the Lower Lake and the Ione.  Pl.'s Supp.
Opp'n at 6.  And the Muwekma contends that "[o]nly three exceptionally narrow reasons may
provide a basis" for "depart[ing] from the law[-]of[-]the[-]case and this Court's mandate," id. at
8 (internal quotation marks omitted): "(1) if there is new intervening law; (2) if a prior holding is
clearly erroneous and would work a manifest justice; and (3) where the evidence in a subsequent
trial or before a second judge is substantially different," id. at 8-9 (footnote omitted), all of which
it argues "do not apply here," id. at 8; see also id. at 9.  Thus, the Muwekma posits that it is
"entitled to summary judgment restoring it to the list of federally recognized tribes."  Id. at 1.

## II.     Standard of Review

Courts will grant a motion for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure only if the moving party has shown "that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). Moreover, "in ruling on cross-motions for summary judgment, the Court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed."  Muwekma Ohlone Tribe, 452 F. Supp. 2d at 113 (citation omitted).  Summary judgment "is an appropriate procedure when a court reviews an agency's administrative record," Shays v. FEC, 424 F. Supp. 2d 100, 109-10 (D.D.C. 2006), and, because this case "involves a challenge to a final administrative action, the Court's review is limited to the administrative record," Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995) (citing Camp v. Pitts, 411 U.S. 138, 142 (1973)).

"The APA entitles a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to "judicial review thereof."  5 U.S.C. § 702; Hill Dermaceuticals, Inc. v. FDA, 524 F. Supp. 2d 5, 9 (D.D.C. 2007).  The APA requires the reviewing court to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In conducting this review, considerable deference must generally be accorded to the agency.  See Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), overruled on unrelated grounds by Califano v. Sanders, 430 U.S. 99, 105 (1977).  Specifically, in the context of this case, the Department has "special expertise" in determining whether petitioning Indian tribes are entitled to tribal recognition, James, 824 F.2d at 1138, and thus, the Court must be particularly deferential to its determinations, Bldg. & Const. Trades Dep't v. Brock, 838 F.2d 1258, 1266 (D.C. Cir. 1988).

Accordingly, "[t]here is a presumption in favor of the validity of the administrative action."

Bristol–Myers Squibb Co. v. Shalala, 923 F. Supp. 212, 216 (D.D.C. 1996); see also James, 824

F.2d at 1138 ("the Department [of the Interior] has been implementing its regulations for

[several] years and . . . it employs experts in the fields of history, anthropology and geneology, to

aid in determining tribal recognition.  This . . . weighs in favor of giving deference to the agency

by providing it with the opportunity to apply its expertise.").

Despite the presumption of validity and the deference that must be afforded to an

agency's actions, a reviewing court "must consider whether the [agency's] decision was based on

a consideration of the relevant factors and whether there has been a clear error of judgment."

Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) (internal quotation marks omitted).

At a minimum, the agency must have considered relevant data and articulated an explanation

establishing a "rational connection between the facts found and the choice made."  Bowen v.

Am. Hosp. Ass'n, 476 U.S. 610, 626 (1986) (citation omitted).

> [A]n agency rule would be arbitrary and capricious if the agency has relied on
> factors which Congress has not intended it to consider, entirely failed to consider
> an important aspect of the problem, offered an explanation for its decision that
> runs counter to evidence before the agency, or is so implausible that it could not
> be ascribed to a difference in view or the product of agency expertise.

Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); see also

Cnty. of Los Angeles v. Shalala, 192 F.3d 1005, 1021 (D.C. Cir. 1999) ("Where the agency has

failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the

court] must undo its action.").  As noted, the "requirement that agency action not be arbitrary or

capricious includes a requirement that the agency adequately explain its result."  Pub. Citizen,

Inc. v. FAA, 988 F.2d 186, 197 (D.C. Cir. 1993).  This requirement is not particularly

demanding, however.  Id.  Nothing more than a "brief statement" is necessary, so long as the

agency explains "why it chose to do what it did." <u>Tourus Records, Inc. v. DEA</u>, 259 F.3d 731,

737 (D.C. Cir. 2001).  Thus, if the court can "reasonably ... discern[]" the agency's path, it will

uphold the agency's decision.  <u>Pub. Citizen</u>, 988 F.2d at 197 (citing <u>Bowman Transp., Inc. v.</u>

<u>Arkansas–Best Freight Sys., Inc.</u>, 419 U.S. 281, 286 (1974)).

### III.    Legal Analysis

The overarching question to be decided by the Court on the parties' cross-motions for

summary judgment is whether to uphold the Department's decision to deny acknowledgment of

the Muwekma as a Native American Tribe entitled "to the protection, services, and benefits"

provided by the Federal government to such entities, as well as the "immunities and privileges

available to other federally acknowledged Indian tribes by virtue of their government-to-

government relationship with the United States." 25 C.F.R. § 83.2.   In addressing this question,

the Court must confront and resolve the following issues: (1) whether the Department unlawfully

terminated federal recognition of the Muwekma as a Native American tribe; (2) whether the

Department's recognition of the Verona band in 1927 established a trust relationship, and

whether any fiduciary duties owed as a result of that relationship were breached by the

Department; (3) whether the Department's Final Determination was arbitrary and capricious; (4)

whether the Department violated the Muwekma's due process rights when it denied a "right to

continued recognition, including the associated services, protections[,] and financial benefits,"

Pl.'s Opp'n at 30; (5) whether the participation in the decision-making and litigation process by

an attorney-advisor at the Department violated Section 554(d) of the APA; and (6) whether the

Department violated the APA and the Equal Protection Clause by requiring the Muwekma to

petition for acknowledgment of its tribal status pursuant to the Part 83 procedures, while waiving

those same procedures for the Lower Lake and Ione tribes.  The Court will consider each issue in turn.

    A.  <u>The Muwekma's Unlawful Termination of Tribal Status Claim</u>

        The Muwekma argues, and it does not appear to be disputed, that "Congress has the sole authority to terminate tribes."  Pl.'s First SJ Mem. at 15.  Because the Muwekma was found to have descended from a Native American tribe (the Verona band) that had been federally recognized until at least 1927, the Muwekma asserts that the Department "had no authority to withdraw [its] recognition in the Final Determination."  <u>Id.</u> at 16.  The Department, on the other hand, responds that this claim is barred by the statute of limitations, and that even assuming the Muwekma has timely brought this claim, the claim is without merit because "it improperly assumes that its descent from the once recognized Pleasanton or Verona band[] automatically indicates that it is a continuously existing political entity."  Def.'s First Cross-Mot. SJ Mem. at 32.

        The Court agrees with the defendants that this claim is barred by the statute of limitations of 28 U.S.C. § 2401(a).  Under this statute, "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  28 U.S.C. § 2401(a).  The moment at which a cause of action first accrues within the meaning of Section 2401(a) is when "the person challenging the agency action can institute and maintain a suit in court."  <u>Spannaus v. U.S. Dep't of Justice</u>, 824 F.2d 52, 56 (D.C. Cir. 1987).  Here, the Department asserts several dates at which the Muwekma could have pursued a cause of action against the agency: (1) in 1927, when the Muwekma contends that "the Department provided [it with only] a fraction of the federal funding and services allocated to . . . Indian tribes, Defs.' First SJ Mem. at 30 (quoting Pl.'s First SJ Mem. at 20); (2) in 1979, when the

Muwekma "was not listed on the Federal Register list of entities recognized by the Secretary of Interior as a tribe," id.; and (3) in 1989, when the Muwekma filed its petition for federal acknowledgment, id. at 31.  Of these three dates, the Court finds that the most obvious point at which the Muwekma could have first brought suit against the agency for purportedly terminating its tribal status was in 1989, when it was clear that it was aware that it was not a federally recognized tribe.  Given that the Muwekma did not bring this action against the Department until 2001, approximately twelve years after it undoubtedly possessed knowledge that it lacked acknowledgment by the federal government as a tribe, its unlawful termination of tribal status claim is plainly barred by the limitations period of 28 U.S.C. § 2401(a).

The Court cannot accept the Muwekma's argument that "[t]he triggering event fixing liability in this case is the [Department's] Final Determination."  Pl.'s First SJ Mem. at 19.  The Muwekma conflates two distinct causes of action that an aggrieved party could, in theory, bring against the Department regarding tribal-acknowledgment status: one for a wrongful denial of federal acknowledgment, and one for a wrongful termination of federal acknowledgment.  The Part 83 procedures fall squarely into the former category; the purpose of such procedures is to determine whether a Native American entity is entitled to a status that it does not have upon petitioning the Department: "[a]cknowledgement of tribal existence."  25 C.F.R. § 83.2.  The procedures are not a mechanism for reviewing whether a federally recognized tribe should retain its tribal status—a process that could lead to litigation falling within the latter cause of action mentioned above because the end result would be the termination of that tribe's status.  Otherwise, it would make no sense that a federally recognized tribe would voluntarily initiate a letter of intent to request acknowledgment under the Part 83 Procedures.  See 25 C.F.R. § 83.4(a) ("Any Indian group in the continental United States that believes it should be acknowledged as

an Indian tribe . . . may submit a letter of intent.").  Thus, the point of accrual for the

Muwekma's cause of action for wrongful termination of tribal status was the moment at which it

realized the federal government no longer recognized the entity as a tribe—a point in time that

occurred long before the Department's issuance of the Final Determination.

The Muwekma's reliance on the "continuing claim" doctrine also fails.  See Pl.'s First SJ

Mem. at 20 n.17.  The "continuing claim" doctrine "allows a plaintiff to get relief for a time-

barred act by linking it with an act that is within the limitations period," Selan v. Kiley, 969 F.2d

560, 564 (7th Cir. 1992), and here, the Muwekma argues that "the linking governmental act

would be the Final Determination itself, which relied heavily on the premise that the Muwekma .

. . was not recognized externally by the Department or others in the period after 1927," Pl.'s First

SJ Mem. at 20 n.17.  Such an application of the doctrine "effectively would eradicate the statute

of limitations" because "lack of formal recognition is the gravamen of the plaintiff['s] complaint,

so only formal recognition could bring an end to the 'continuing claim,'" thereby "preserving

[the Muwekma's] cause of action until it becomes moot."  Miami Nation of Indians of Indiana,

Inc. v. Lujan, 832 F. Supp. 253, 257 (N.D. Ind. 1993).  The "continuing claim" doctrine,

therefore, has no application to the facts of this case.

Accordingly, the Court concludes that the Muwekma's cause of action based on its claim

that the Department wrongfully terminated its tribal status is barred by the statute of limitations.

B.   The Muwekma's Arbitrary and Capricious Claim

The Muwekma argues that "the [Department's] Final Determination was arbitrary and

capricious because it improperly . . . rejected or misconstrued substantial evidence demonstrating

that the Tribe satisfied the recognition criteria."  Pl.'s First SJ Mem. at 35.  With respect to the

requirement under Section 83.8(a) that the Muwekma proffer evidence that it had been identified

as a tribal entity by external sources on a substantially continuous basis, the Muwekma contends

that the Department arbitrarily rejected evidence that members of the organization "enrolled . . .

in the California Judgment Act," id. at 37, because "the BIA required applicants to identify their

tribal affiliation in sworn and witnessed applications," see id. at 38 (noting that the application

asked "What is your degree of Indian blood and to what Tribe or Band of Indians of the State of

California do you belong?"), and that "the Bureau approved these applications, including the

response of the Muwekma . . . members who replied to this [inquiry] by referring to the Mission

San Jose," id.  The Muwekma also argues that the Department erred in "reject[ing] evidence that

[its] members attended BIA boarding schools in Oregon and . . . California during the 1930[]s

and 1940[]s on the ground that the record did not indicate whether these tribal members were

accepted based on their degree of Indian blood or membership in a recognized tribal group,"

because the Department may not provide special services to Indians on the account of their race.

Id. at 39 (citing Morton v. Mancari, 417 U.S. 535, 553-54 (1974)).  Lastly, the Muwekma asserts

that "[t]he Final Determination arbitrarily rejected substantial evidence of external identification

by scholars, including a 1955 report . . . prepared by anthropologists Alfred L. Kroeber and R.F.

Heizer," id. at 39, as well as "references to the continuing existence of the Muwekma Ohlone

people in a book written in 1978 by Malcolm Margolin" and in a 1978 Smithsonian publication,

id. at 40.  In rejecting all of this evidence, the Muwekma contends the Department "appl[ied] a

standard of proof far beyond the regulatory standard" of proof, id. at 35, and that "the

Department ignored critical historical circumstances" in its Final Determination by "fail[ing] to .

. . account [for] the impact of the lack of a landbase and the particularly horrible experience of

California tribes on the [Muwekma's] ability to document its prior activities," id. at 36.

The Court finds all of the Muwekma's arguments to be without merit.  With regard to the Muwekma's contention that its members participated in the California Claims Act, the Department reasonably concluded that such evidence did not constitute an external identification of the Muwekma.  The Department adequately explained that applicants' indications of some association to "Mission San Jose" in response to the question: "What is your degree of Indian blood and to what Tribe or Band of Indians of California do you belong?" is insufficient to constitute an external identification of the Muwekma because that identification "referred to 19th century tribal ancestry, not to contemporary membership."  Pl.'s First SJ Mem., Ex. 6 (Final Determination) at 22.  The Department's conclusion is further supported by the answers provided by two other approved applicants who answered the same question by stating "Tribal name unknown" and "Ohlones(?) Tribal name [u]nknown."  Id.  As the Department noted, "an individual's active tribal membership would not be unknown to him or her, while his or her specific tribal ancestry back to 1852 could be unknown."  Id. at 22-23.  The Court does not find the Department's analysis to be wanting in logic, and thus there is no reason for the Court to disturb the agency's conclusions regarding this evidence.

Likewise, the Court finds the Department's conclusion that attendance at a BIA boarding school did not require membership in a federally recognized tribe to be supported by the record. First, the Court is not persuaded that the BIA's admission of students in its boarding schools must have been based on their tribal membership, rather than their race as Indians, because of the Supreme Court's decision in Mancari.  See Mancari, 417 U.S. at 554 (holding that the Indian Reorganization Act's employment preference for qualified Indians does not constitute invidious racial discrimination because "[t]he preference, as applied, is granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives and activities

are governed by the BIA in a unique fashion.").  Even assuming that the Court agreed with the

Muwekma that, under Mancari, "the legal basis for providing special services to Indians is not

their race but the political relationship between the tribe and the federal government," Pl.'s First

SJ Mem. at 39., the Mancari decision was issued in 1974, decades after the Muwekma's

members attended these boarding schools, see id. (discussing evidence of attendance at BIA

boarding schools "during the 1930[]s and 1940[]s").  The Court cannot logically conclude that

the Mancari decision has any relevance to the BIA's earlier student admissions policies for its

schools; such illogical reasoning is no more convincing than the premise that segregation did not

exist in the 1940s because the Supreme Court later held the practice unconstitutional in Brown v.

Board of Education of Topeka, 349 U.S. 294 (1955).  Thus, Mancari can have no sway on the

Court's analysis of the Department's position concerning earlier BIA boarding school

attendance.

Second, the Department closely analyzed one of the boarding school student's

applications, which it noted did not include "information on tribal membership and . . . tribal

certification or endorsement."  Pl.'s First SJ Mem., Ex. 6 (Final Determination) at 31.  The

Department noted that the applicant had identified his tribe as "Mission," and that such a

reference was merely a "generic" one that "applies to many separate Indian groups," and not the

Muwekma specifically.  Id.  This conclusion is consistent with the Department's observation that

various "Ohlone" Indians "were concentrated by the Spaniards before 1834 at the Mission San

Jose," id., Ex. 7 (Proposed Finding – Summary) at 10, and that several other Native American

entities have claimed descent from those Indians residing at the Mission San Jose, see id., Ex. 7

(Proposed Finding) at 9 (noting that the existence of other "Ohlone" applicants demonstrates that

"the Muwekma . . . does not have an uncontested claim to represent the descendants of all the

Ohlone of the San Francisco Bay Area or all the territory of the Costanoan-speaking peoples"). The Department's conclusion is further buttressed by a 1944 letter which stated: "There is no doubt but what these children have sufficient Indian blood to admit them to a Government Boarding School." Id., Ex. 6 (Final Determination) at 31.  This evidence, when viewed collectively, plainly supports the Department's conclusion that evidence of attendance at BIA boarding schools does not reasonably demonstrate identification of the Muwekma by an external source.

Third, the Court does not find any error in the Department's rejection of the Muwekma's scholarly evidence.  According to the Department, the author of the <u>Smithsonian</u> article merely "described the Costanoan language family and concluded that the aboriginal Costanoan were neither a single ethnic group nor a political entity." Id., Ex. 7 (Proposed Finding) at 76 (internal quotation marks omitted).  With regard to Kroeber and Heizer's 1955 paper, the Department found the authors to be arguing "that even though Indian cultures had become extinct, Indian populations had not." Id., Ex. 6 (Final Determination) at 33.  This proposition, the Department found, "was a statement about the survival of individual descendants, rather than Indian groups." Id.  Accordingly, "[b]ecause [Kroeber and Heizer] referred to surviving descendants rather than groups, they did not identify an Indian entity in either [the 1930s or 1950s]." Id.  As for the 1978 Margolin book, the Department acknowledged that "[i]n general, the book is an analysis of an Ohlone lifestyle prior to European settlement," which it found "is not relevant to an analysis of the [Muwekma] since 1927." Id., Ex. 6 (Final Determination) at 44.  Moreover, the Department found that "[w]hile Margolin acknowledged the existence of living Ohlone individuals [when his research was conducted, he] did not identify" any Indian entity in 1978. Id.  There is nothing in

these findings from which the Court can conclude that the Department erred in rejecting this evidence as external identifications of the Muwekma.

Lastly, the Court is not persuaded that the Department misapplied 25 C.F.R. § 83.6. None of the evidence proffered by the Muwekma establishes a "reasonable likelihood" that external sources had identified it as a Native American tribe; simply because the Muwekma believes that its evidence is persuasive does not mean it is so. As the Department sufficiently explained in its Proposed Finding and Final Determination, the evidence proffered by the Muwekma and discussed above has no bearing on the issue of whether external sources identified it as a Native American tribe. Moreover, the Court does not discern how it could find that the Department failed to consider the Muwekma's "historical circumstances" in assessing its application for federal acknowledgment. See Pl.'s First SJ Mem. at 36. Indeed, the Muwekma does not explain how "the particularly horrible experience of California tribes," id., would have affected its ability to retain documentation of its existence after 1927.[12] Thus, the Court finds this argument to be without merit.

For the foregoing reasons, the Court finds that the agency's Final Determination was not arbitrary and capricious and must therefore be upheld.

C.  The Muwekma's Breach of Fiduciary Duty Claim

Next, the Muwekma argues that the Department's recognition of the Verona band in 1927 established a trust relationship, that the Department owed the Muwekma fiduciary duties as a result of that relationship, and that these duties were breached by the Department. Pl.'s First Mem. at 18. Specifically, the Muwekma argues that "[o]nce the Department recognized [it in

---

[12] Indeed, the "horrible" experiences alleged by the Muwekma took place several decades before 1927, the point at which it was required to produce evidence of its continuing tribal existence. See Pl.'s First SJ Mem. at 2 ("During the late nineteenth century, non-Indians were particularly hostile to tribes, seeking out and killing Indians outright, often encouraged by local governments." (emphasis added)).

1927] . . . as a tribe under its care and supervision, it had a duty to support and preserve the

Tribe," and that the Department "lacked authority . . . to resign from or terminate the trust." <u>Id.</u>

at 19.  Furthermore, the Muwekma argues that even assuming the Department possessed the

authority "to unilaterally withdraw from the . . . trust relationship . . . , it failed to do so in

accordance with basic principles of fairness and trust responsibility."  <u>Id.</u> at 20.

      The Court is not persuaded by the Muwekma's position.  Even if a trust relationship was

created as a result of the federal government's recognition of the Verona band, the Muwekma's

argument assumes that it was the Department that withdrew from that relationship.  After all, as

Judge Posner noted in <u>Miami Nation of Indians of Indiana, Inc. v. U.S. Dep't of the Interior</u>, 255

F.3d 342, 346 (7th Cir. 2001), "[i]t is . . . obvious that Indian nations, like foreign nations, can

disappear over time . . . whether through conquest, or voluntary absorption into a larger entity, or

fission, or dissolution, or movement of population."  Should a tribe cease to exist, it follows that

the federal government would no longer have a trust relationship with that entity.  <u>See id.</u> at 350

("If a nation doesn't exist, it can't be recognized").  The Muwekma thus needs to demonstrate it

did not cease to exist after 1927, and the manner in which the Muwekma is required to prove its

existence as a tribe is through the Part 83 procedures.  <u>See</u> 25 C.F.R. § 83.2 ("The purpose of . . .

[P]art [83] is to establish a departmental procedure and policy for acknowledging that certain

American Indian groups exist as tribes.").  And, because the Court finds that the Department's

decision to deny acknowledgment of the Muwekma as a Native American tribe was a legally

defensible position, the Court also finds that the Department did not owe the Muwekma any

fiduciary duties after 1927, and that any purported breach asserted by the Muwekma after this

date is without merit.

D. The Due Process Claim

The Muwekma argues that "[t]he Department's application of 25 C.F.R. [§] 83 failed to afford [it] due process for the withdrawal of recognition."  Pl.'s First SJ Mem. at 31. Specifically, the Muwekma asserts that "[t]he right to continued recognition, including the associated services, protections[,] and financial benefits, once the right has been established, is a property right that cannot be revoked without due process."  Id. at 30.  The Muwekma argues that "[t]he hallmarks of procedural due process—notice, opportunity to be heard, and an impartial decision[]maker—were entirely lacking in the Department's procedures," and while the Muwekma acknowledges being consulted in the decision by the Department's staff, the Department did not provide it a formal hearing.  Id. at 32.  Furthermore, the Muwekma complains that it was not afforded an "opportunity to cross-examine the staff professionals who developed and interpreted [the] evidence against [it]."  Id.  The Court finds this claim meritless.[13]

The Muwekma's due process claim cannot be maintained due to the Muwekma's failure to demonstrate that it possessed a property right in its prior acknowledgment.  As noted above, the Seventh Circuit has recognized that "[i]t is . . . obvious that Indian nations, like foreign nations, can disappear over time . . . whether through conquest, or voluntary absorption into a larger entity, or fission, or dissolution, or movement of population."  Miami Nation, 255 F.3d at 346.  Whether the Verona band continued to exist as an entity after 1927 and whether the Muwekma's property right in federal acknowledgment ceased to exist along with the entity itself at the moment of dissolution are both questions the Department had to address.  And it was the Muwekma's burden to establish that, in fact, it continued to exist as a tribe after 1927 through

---

[13] Given that this claim is based on the purported "withdrawal of recognition" by the Department, it appears to the Court that this claim is seemingly also barred by the statute of limitations.  See supra at 34.  The Department, however, does not argue anywhere in its submissions that the Muwekma's due process claim is barred by the statute of limitations, and thus the Court will not make that determination.

the Part 83 procedures.  See id.; Koerpel v. Heckler, 797 F.2d 858, 863-65 (10th Cir. 1986)

(holding that the plaintiff bears the burden of proving the existence of a constitutionally

protected property interest).  Having failed to meet this burden, the Muwekma has failed to

establish that the Department violated the Due Process Clause in issuing its Final Determination.

E.  The Muwekma's Conflict-of-Interest Claim

The Muwekma argues that the Department violated 5 U.S.C. § 554(d) by allowing "one

of its attorney[-]advisors" to advise the Department concerning its "decision on the merits of

Muwekma's petition for recognition," and to also allow the same attorney-advisor to "represent[]

the Department in the Muwekma v. Babbitt litigation" that took place before Judge Urbina.  Pl.'s

First Mem. at 33.  This argument rests on a misinterpretation of the APA.  The various

subparagraphs of Section 554 apply only to "every case of adjudication required by statute to be

determined on the record after opportunity for an agency hearing."  5 U.S.C. § 554(d).  Here, the

Muwekma does not cite, nor is the Court aware of, a statute that requires the Department to

provide a hearing to an applicant seeking acknowledgment as a Native American tribe.  Thus,

Section 554(d) has no application to this case.

F.  The Muwekma's Equal Protection Claim

Finally, the Muwekma argues that the Department "violated [the E]qual [P]rotection

[Clause] and the APA by restoring two similarly situated California tribes based on a lower

evidentiary standard while denying" the Muwekma the opportunity to seek recognition under the

same standard.  Pl.'s First SJ Mem. at 21-22.  Both the Equal Protection Clause and the APA

prohibit agencies from treating similarly situated petitioners differently without providing a

sufficiently reasoned justification for the disparate treatment.  See, e.g., Settles v. U.S. Parole

Comm'n, 429 F.3d 1098, 1102-03 (D.C. Cir. 2005) ("To prevail on [an] equal protection claim,

[a plaintiff must] demonstrate that [it] was treated differently than similarly situated individuals [or entities] and that the [agency's] explanation does not satisfy the relevant level of scrutiny." (citing Plyler v. Doe, 457 U.S. 202, 216 (1982)); Cnty. of Los Angeles v. Shalala, 192 F.3d 1005, 1022 (D.C. Cir. 1999) (holding that "an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently" (internal quotation marks and citations omitted)); Freeman Eng'g Assocs. v. FCC, 103 F.3d 169, 178 (D.C. Cir. 1997) (observing that "an agency may not treat like cases differently" (internal quotation marks and citation omitted)); Petroleum Commc'ns, Inc. v. FCC, 22 F.3d 1164, 1172 (D.C. Cir. 1994) (stating that the District of Columbia Circuit has "long held that an agency must provide [an] adequate explanation before it treats similarly situated parties differently" (citations omitted)). To the Court's knowledge, the District of Columbia Circuit has not explicitly defined what constitutes "similarly situated," but at least one other circuit has defined that term to mean that the two classes being compared are "prima facie identical in all relevant respects, or directly comparable . . . in all material respects."  Racine Charter One, Inc. v. Racine Unified Sch. Dist., 424 F.3d 677, 680 (7th Cir. 2005) (internal citations and quotation marks omitted).

In addressing the Muwekma's equal protection claim, the Court must first address an observation made in its September 30, 2008 Order, wherein the Court construed the September 21, 2006 Memorandum Opinion as having "implicitly[,] if not explicitly, [concluded] that the [Muwekma] is similarly situated to Ione and Lower Lake."  September 30, 2008 Order, at 8, Muwekma v. Babbitt, No. 03-cv-1231 (RBW) (D.D.C.).  As noted above, the Department represents that it "did not understand the Court's Order of September 21, 2006, to have held that [the Muwekma] was similarly situated to Ione and Lower Lake in that the Court concluded that . . . 'it lacks sufficient information about the Department's decision to recognize Ione and Lower

Lake outside of the Part 83 process."  Defs.' Supp. Mem. at 16 (quoting Muwekma, 452 F. Supp.

2d at 113).  The Muwekma, for its part, expressed its agreement with the Court's Order that the

Department "was . . . bound to follow the mandate of this Court and limit the scope of its remand

to the Memorandum Opinion's order of an 'express justification' and a 'detailed explanation of

the reasons' for requiring Muwekma to proceed through the lengthy federal acknowledgment

process while exempting" the Lower Lake and Ione.  Pl.'s Supp. Opp'n at 6.

Upon further reflection, the Court acknowledges that its September 30, 2008 Order

incorrectly represented the ruling in its September 21, 2006 Memorandum Opinion.  As the

Department correctly observed, Defs.' Supp. Mem. at 1, the Court did not decide the question of

whether the Muwekma was "similarly situated" to the Lower Lake and Ione, see Muwekma, 452

F. Supp. 2d at 116 (noting that the relevant inquiry before the Court was "whether the

Department has provided a rational basis for requiring [the p]laintiff to adhere to the Part 83

procedure while exempting other tribes that are purportedly similarly situated" (emphasis

added)).  Indeed, "the Court's review [was] limited to the administrative record," Fund for

Animals, 903 F. Supp. at 105 (citing Camp, 411 U.S. at 142), and, as the Court noted numerous

times in the September 21, 2006 Memorandum Opinion, the record did not reveal any

consideration by the Department of whether the Muwekma was entitled to the same waiver of

the Part 83 procedures that was granted to both the Lower Lake and the Ione, see Muwekma, 452

F. Supp. at 113 (concluding that the Court "lack[ed] sufficient information about the

Department's decision to recognize Ione and Lower Lake outside of the Part 83 process to

resolve [the p]laintiff's equal protection and APA claims"); id. at 119 ("[T]he [Department has]

cited nothing to explain the basis for the Department's decision to treat Muwekma differently

from Ione and Lower Lake."); id. at 120 ("[T]he administrative record contains no indication

why the Department would refuse to consider Muwekma's requests for administrative correction while allowing Ione and Lowe Lake to proceed outside the Part 83 process.").  Without running afoul of well-settled law circumscribing this Court's review of the Department's Final Determination, the Court could not have decided the question of whether the Muwekma, Lower Lake, and Ione were "similarly situated."  Thus, contrary to the Court's observations in the September 30, 2008 Order, the Department was instructed on remand to address whether the several tribes were similarly situated, and it necessarily could make that assessment only by reviewing the record evidence.

Consequently, the Court must review the Department's supplement to the administrative record to determine whether the agency provided an adequate explanation "why it chose to do what it did," Tourus Records, Inc. v. DEA, 259 F.3d 731, 737 (D.C. Cir. 2001)—to wit, denying the Muwekma a waiver to obtain federal acknowledgment without proceeding through the Part 83 process.  And, the Court now finds the Department's explanation sufficient.   The Department explained that the record reflects a "pattern of federal dealings with the Lower Lake and Ione which evidences their long-standing and continuing governmental relationship with the United States," whereas, the Muwekma had no such interactions with the Federal Government.[14]  Defs.' Second SJ Mem at 8.

With regard to the Lower Lake, the Department noted that "[t]he Federal Government purchased land to establish the Lower Lake Rancheria on January 25, 1916," and that "[t]he [G]overnment held this land in trust until the Act of 1956 authorized its sale."  Id.  The

---

[14] The Department also argues that the Muwekma is not similarly situated to the Lower Lake and the Ione because it "lacks collective rights in lands."  Defs.' Second SJ Mem. at 13.  The Court need not assess the merits of this contention, however, because it finds that the Muwekma's lack of interactions as an entity with the federal government is sufficient to support the Department's conclusion that the Muwekma is not similarly situated to the Lower Lake and Ione tribes.

Department also cited other instances demonstrating communications and dealings between the federal government and the Lower Lake.  See id. (citing various reports that contained a "recommend[ation] that land be purchased for the Lower Lake band," a recommendation "to acquire additional land for the band and other small groups," and an observation noting "the existence of a Lower Lake group living off the rancheria").  The Department also noted that the Lower Lake had been identified by the federal government on two separate instances—in 1953, when the United States "House of Representatives listed the Lower Lake Rancheria" in House Report 2503, and in 1980, when "the BIA central office and regional office considered including the Lower Lake Rancheria on the list of federally recognized tribes, but did not do so."  Id. Based on these interactions with the federal government and the earlier references to it as an entity, the Court has no basis for finding that the Department's conclusion that the "Lower Lake and Muwekma were not similarly situated," id. at 6, is arbitrary and capricious.

Likewise, the supplement to the administrative record also identifies a history of dealings between the federal government and the Ione.  In 1915, a special agent for the BIA identified the Ione in a census conducted by the agency, and that "[t]he [f]ederal [g]overnment attempted to purchase land for" the Ione at that time.  Id. at 7.  The Department then noted that "the Indian Office obtained a deed and abstract of title for the purchase of land for the Ione[,] . . . and the Department provided the Office with a formal "Authority" for the purchase.  Id.  Documents in the record also reflect the federal government's "extensive, but unsuccessful, effort[] to clear title to the land for the" Ione from 1915-1925.  Id.  The record further reveals efforts made by the Ione to inquire as to the status of its tribal lands.  See id. at 7-8 (noting that "[i]n 1941, the Department considered a petition from the 'Indians of the Ione Valley' requesting the purchase of land," and that "[i]n 1970, two Ione individuals contacted the BIA about the status of the land

on which they lived," and subsequently "the California Rural Indian Land Project . . . of the California Indian Legal Services proposed bringing a quiet[-]title action on behalf of the Ione Band . . . and requesting that the land be accepted and held in trust").  The Court finds these facts, which the Department found to have evidenced a "historical circumstance of an uncompleted acquisition of trust land on the [Ione's] behalf," sufficient to differentiate the Ione from the Muwekma.

The Muwekma argues, however, that there is actually no longstanding pattern of federal dealings between the federal government and the Ione and the Lower Lake because the record reflects "large periods of time in which [the Department] had no relationship with Ione or Lower Lake."  Pl.'s Reply to Second SJ Mem. at 7.  The Muwekma's argument misses the point. Unlike the evidence proffered by the Muwekma, which at best demonstrated interactions between the federal government and individuals that descended from the Verona band, the evidence in the supplemental administrative record reflects dealings between the federal government and the Ione and Lower Lake tribes as entities.  The Department viewed its interactions with the Ione and Lower Lake tribes as evidence that the federal government dealt with these entities as tribes, and thus concluded that it was appropriate to acknowledge these tribes outside of the Part 83 process.  Thus, the Department's conclusion that the Muwekma was not "similarly situated" to the Ione and Lower Lake must be upheld.

## IV.    Conclusion

Despite the Muwekma's efforts to raise a smorgasbord of claims in an attempt to reverse the Department's Final Determination, the Court finds that there exists no basis upon which it may overturn the agency's findings.  Accordingly, the Court must grant the Department's cross-motion for summary judgment, and deny the Muwekma's motion for summary judgment.

**SO ORDERED** this 28th day of September, 2011.[15]

REGGIE B. WALTON
United States District Judge

---

[15] An Order will be issued contemporaneously with this Memorandum Opinion (1) granting the Department's cross-motion for summary judgment, (2) denying the Muwekma's motion for summary judgment, (3) closing this case, and (4) denying the Muwekma's Motion for Status Conference, which the Court deems as moot in light of the foregoing rulings.